UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| ELIZABETH ANN GOODALE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 3:19-CV-409-KAC-DCP |
| | ) | |
| ELAVON, INC., a wholly-owned subsidiary of US BANK, N.A., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SPOLIATION SANCTIONS AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the Court are (1) Plaintiff's "Motion for Spoliation Sanctions Including Application of the 'Missing Evidence Rule'" [Doc. 71], Defendant's "Response in Opposition" [Doc. 81], and Plaintiff's "Reply to Defendant's Response" [Doc. 85] and (2) Defendant's "Motion for Summary Judgment" [Doc. 55], Plaintiff's "Response in Opposition to Defendant's Motion for Summary Judgment" [Doc. 73], and Defendant's "Reply Memorandum in Support of Motion for Summary Judgment" [Doc. 80]. The Court **DENIES** Plaintiff's "Motion for Spoliation Sanctions" [Doc. 71] because Plaintiff has not demonstrated that Defendant had an obligation to preserve the evidence at issue. And because there are no genuine disputes of material fact regarding Plaintiff's claims for age discrimination, the Court **GRANTS** Defendant's "Motion for Summary Judgment" [Doc. 55].

# I.  Background

## A.  Factual Background[1]

On April 9, 2004, a subsidiary of U.S. Bank that later became Elavon, Inc. hired Plaintiff Elizabeth Goodale as an Account Services Representative 3 [Docs. 57-1 at 9 (Jan. 24, 2022 Deposition of Elizabeth Goodale ("Jan. 24, 2022 Goodale Dep."), 9:13-23, 25:21-24); 69-4 at 6-7 (Deposition of Greg Hiers) ("Hiers Dep."), 18:23, 24:6-9); 57-30 at 25].  On October 1, 2014, Plaintiff was promoted to the position of customer account manager ("CAM") at the request of her manager, Greg Hiers [Docs. 57-1 at 9 (Jan. 24, 2022 Goodale Dep. 26:12-27:3, 27:18-19); 57-2 at 7 (Jan. 26, 2022 Deposition of Elizabeth Goodale ("Jan. 26, 2022 Goodale Dep."), 24:21); *see also* 57-30 at 25].  As a CAM, Plaintiff managed "all aspects of [clients'] credit card processing" and worked on accounts with credit card volume between $1 million and $15 million [Doc. 57-1 at 9 (Jan. 24, 2022 Goodale Dep. 28:23-29:1)].

Defendant Elavon, Inc. used the volume of "outbound calls," about sales, equipment, and client retention to assigned accounts, made by each CAM as one metric to evaluate CAM performance [Docs. 57-1 at 10 (Jan. 24, 2022 Goodale Dep. 30:5-10, 31:10-17, 33:10-12, 33:15-16); 57-2 at 6 (Jan. 26 Goodale Dep. 19:19-22); *see also* Docs. 69-4 at 13 (Hiers Dep. 46:2-3, 14-15; 47:14-15); 69-7 at 4 (Response to EEOC Charge of Discrimination)].  An acceptable outbound call entailed "[a] meaningful interaction with a customer" to "[c]heck[] on the health of the account, look[] for sales opportunities" or as a "follow-up item from an e-mail" [Docs. 69-5 at 9 (Deposition of Christopher Dover ("Dover Dep."), 31:2-8); 57-11 at 15 (Hiers Dep. 56:16-18)].

---

[1] Because Defendant moved for summary judgment, the Court describes the facts in the light most favorable to Plaintiff.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

2

CAM managers "monitor[ed] the team's calling activity via a software application that allow[ed] [them] to listen to calls made by [CAMs]" [Doc. 69-5 at 10 (Dover Dep. 35:15-17)].

At some point in January or February of 2016, Plaintiff made "five or more or ten" complaints about "several issues" to Andy Popwell, a Vice President at Elavon [Doc. 57-1 at 27 (Jan. 24, 2022 Goodale Dep. 100:22-24, 108:23)]. One complaint occurred after Plaintiff received a 2015 annual review that ranked her slightly lower than her trainee, which "mean[t] [that her trainee would] get a better raise" [*Id.* at 23-24 (Jan. 24, 2022 Goodale Dep. 84:3-15, 86:7-15)]. Plaintiff emailed Popwell about the rankings, and she specifically testified:

> A. I sent Andy a little—I think I sent Andy an e-mail. And Andy came back with, well, everybody brings something different to the table. And so if [the trainee] got a better score, even though he was still sort of training under me, then that means that he brought something different to the table than me.
> Q. Okay. Did Andy explain what?
> A. No. Maybe because he spoke Spanish. I don't know, but, no, he didn't, no.
> Q. He just didn't give you any more explanation about it?
> A. No.
> Q. So you asked the question. Did you go to HR about that?
> A. No.
> Q. Ethics complaint?
> A. No.
> Q. Anything else?
> A. No, because I—because I was going to go through our group.

[*Id.* at 24 (Jan. 24, 2022 Goodale Dep. 86:15-87:14)]. Plaintiff further described the discussion with Popwell in her own words:

> A. . . . . I know I sent him a message and—yeah. But I'm not sure exactly at what time frame it would have been. But, again, we were talking about, you know, the type of discrimination or whatever and—
> Q. *You were talking to Mr. Popwell about discrimination?*
> A. *No, no, no.* I said you and I were talking about that.
> Q. Yeah.

[*Id.* at 30-31 (Jan. 24, 2022 Goodale Dep. 113:4-114:4) (emphasis added)]. Around the same time, Plaintiff also spoke with Popwell about "escalations" she received from newer employees [*Id.* at 25 (Jan. 24, 2022 Goodale Dep. 93:13-15)]. Plaintiff explained:

> A. And the conversation with Popwell would include, you know, ***how our business model is set up***, my conversation with him. ***The escalations that moved in my direction and when the newer people can't handle their business***, that the customer center, the customer service center should be able to handle some of those calls coming in in the evenings from our West Coast team of people. They shouldn't all just come to me as an escalation. There's someone else that can handle these calls. And so that was a big conversation with Andy. ***Another conversation was, again, the business model of how, you know, how we were doing business in CAM***, you know, the phone calls as opposed to escalations. Can we do one or the other? If we're a retention group, can we focus on retaining our customers instead of calling out to our customers? Those are the type of conversations that we had with Andy.

[*Id.* at 25-26 (Jan. 24, 2022 Goodale Dep. 93:11-94:4) (emphasis added)].

In March of 2016, Chris Dover joined the CAM team as director of small to medium business [Docs. 69-5 at 5 (Dover Dep. 17:25-18:16, 26:9-14)]. He managed Hiers, now a CAM manager, and reported to Popwell [Docs. 57-1 at 12, 25, 29 (Jan. 24, 2022 Goodale Dep. 38:12-16, 92:23-93:1; 108:23); 69-4 at 9 (Hiers Dep. 30:15-25); 69-5 at 6-7 (Dover Dep. 18:23-19:7, 24:21-23)]. In this role, Dover made the ultimate decision regarding whether to terminate any employee under his management or CAM team members [Docs. 69-4 at 11, 23 (Hiers Dep. 38:5-15, 88:23-24); 69-5 at 17 (Dover Dep. 69:12-13)]. Sometime "[a]round th[e] time frame" "after October [2016] and before January [2017]," Dover said, "I can get rid of you and bring in younger, newer, younger, much younger people" in a CAM meeting [Doc. 57-1 at 33 (Jan. 24, 2022 Goodale Dep. 123:20-132:25)]. According to Plaintiff, Dover made this comment "in a team meeting" "discussing what was going on in [the] group as a whole" with "an entire group of CAMs" at "a

4

conference room at Elavon" after several CAMs discussed "what [wa]s being put on [them] as seasoned people" [*Id.* at 33-35 (Jan. 24, 2022 Goodale Dep. 124:13-126:14, 131:20-21)].

In the fall of 2016, three (3) CAMs working under Hiers's management each received promotions and a six-percent raise [*See* Doc. 57-1 at 13 (Jan. 24, 2022 Goodale Dep. 42:14-44:11); 57-2 at 13, 27 (Jan. 26, 2022 Goodale Dep. 45:24-46:6, 102:22-25)]. In October 2016, Plaintiff, who was sixty (60) years old, was "promoted to public sector customer account manager" and "promised" a six-percent raise, but she did not receive the raise [Doc. 57-1 at 11-12 (Jan. 24, 2022 Goodale Dep. 37:18-21, 40:3-7)]. In early December 2016, Plaintiff spoke with Tim Miller, a Vice President who "was not directly involved in [her] department," about this situation [Docs. 57-1 at 12 (Jan. 24, 2022 Goodale Dep. 40:1-4, 41:11-25)]. Plaintiff testified:

> A. Well, I said, Tim, I was promoted to government public sector rep within my group . . . And I was promised by my manager, Greg Hiers, a six percent raise, just like the three other—four other guys in our group were promised and they said they all got theirs and I did not get my six percent raise. And the reason Greg said I didn't get it or he had been working on it and then finally Greg said that, well, you know, we don't—we've given out a lot of increases. He didn't say raises, increases over the past month or whatever. We just, you know, will not be giving out any—we just don't have it. And Tim Miller said, you got a promotion, you were promised a raise, you should have gotten it. And even though whatever else they were doing in the group to give everybody this big increase, that raise was an allotment that was already put in place and you should have gotten it. That's what the conversation was with Tim.

[*Id.* at 24 (Jan. 24, 2022 Goodale Dep. 87:22-88:18)]. Plaintiff was asked whether Miller communicated his conversation with Plaintiff to Dover or Hiers, and she answered:

> A. I don't know. I just don't know.
> Q. So none of them ever said anything to suggest that to you?
> A. No.

[*Id.* (Jan. 24, 2022 Goodale Dep. 89:3-8)].

5

On January 12, 2017, Popwell increased the CAMs' outbound call goal from 500 calls a month to 700 calls per month [Docs. 69-4 at 16 (Hiers Dep. 57:13-17, 58:9-14); 69-5 at 9 (Dover Dep. 31:13-16)]. That same month, management "had a training class," which discussed, among other topics, "a policy" of not "artificially inflat[ing] [CAM] call numbers" [Doc. 69-5 at 11-12 (Dover Dep. 39:9-13, 40:5-7, 41:1-3, 19-20)]. Dover explained the purpose of the training class:

> We had seen a lot of different behaviors from people to try to bump up their call numbers, and we had addressed it specifically in a meeting back in January indicating to the team that erroneous or unproductive phone calls would not be tolerated, that the calls were monitored, recorded, we were actively listening to the calls, and that they would be disciplined accordingly for making fraudulent phone calls.

[*Id.* at 21 (Dover Dep. 78:10-18)]. All CAM calls were recorded [*Id.* at 10 (Dover Dep. 35:20-21)]. Plaintiff testified that call monitoring "started late year end [2016] . . . or early January [2017]" [Doc. 57-1 at 17 (Jan. 24, 2022 Goodale Dep. 61:11-12)]. Dover and Hiers audited "at least one call" "every month" for each CAM [Doc. 69-5 at 10 (Dover Dep. 35:24-36:1)]. While searching for calls of an appropriate length for compliance review on February 23, 2017, Dover heard:

> [A]n automated "thank you for calling," you know, and then there would be key entries on the telephone that you could hear through the call application to transfer or maybe entering a number and then [the voice recognition system] would then cycle back to the beginning and there would be additional—you know, maybe an input or maybe some silence. You could hear people talking to their peers in the background, et cetera. Sometimes there would be no entries and it would just be the press one to enter information or press two to go here, and it would just sit there and then it would time out. In other words, the [voice recognition system] would stop talking, but the call would continue, and then it would cycle back through. No characters or entries would ever be made and then after about two or three minutes, that call would be disconnected. I observed—I was like, "That was weird. What was that number?" So, again, you can search by the telephone number. So I entered that telephone number in and saw dozens of calls being made to that particular number.

[*Id.* at 11 (Dover Dep. 37:24-38:21); Doc. 57-21 at 3]. Upon initial review, Dover discovered that two CAMs, Ronald Fleece and Lori Coile, dialed this phone number, and he learned that the

6

number was an American Express automated phone number [*Id.* (Dover Dep. 39:4-5); Doc. 57-21 at 3]. Dover thought this conduct was "very suspicious activity, given the fact that [CAM management] had had a conversation very recently with the team about not making any kind of erroneous dials" [Doc. 69-5 at 11-12 (Dover Dep. 39:7, 41:13-14)]. He further viewed it as "a violation of trust" and "a violation of US Bank policy"—essentially "manipulating sales numbers" for a CAM's "own advantage" [*Id.* at 12 (Dover Dep. 41:14-17)]. Hiers classified the conduct as "a red flag" because it was "blatant that this thing, number, was used over, and over, and over again" [Doc. 69-4 at 17 (Hiers Dep. 64:18-22)]. He testified:

> [T]he number being dialed, was the number that was dialed repeatedly. Whereas you might use that number once a week, or maybe be a shorter duration if it's used at all.

[*Id.* at 39 (Hiers Dep. 150:10-15)].

That same day, Dover called Emmett Heath, a Human Resources Business Partner "to help [him] conduct the necessary research in order to determine the scope of what was identified and then to advise [him] on next steps" [Doc. 57-25 at 14-15 (Dover Dep. 52:24-53:2)]. Dover then emailed Heath about the outbound calls, stating that they "connect to an AMEX automated system that allows the caller [to] verify . . . info like DBA Name" [Docs. 57-13 at 2; 57-21 at 3; 69-5 at 14 (Dover Dep. 49:9-50:1)]. Dover sent Heath a screenshot of the calls Fleece and Coile made to the American Express automated phone number [*See* Doc. 57-13 at 2-8]. The email showed that Coile made 136 calls to the American Express automated phone number, and Fleece made forty-six (46) calls [*Id.* at 3-8]. In his email, Dover stated "[a]n occasional call to this service could be justified in the CAM role, however as the information below indicates individuals are spending entire days over months calling nothing but this number" [*Id.* at 2]. He further stated that "[t]he fact that these individuals would be willing to cheat this [key performance metric] destroys any

7

trust that I have for other parts of their job" and that he would "review all calls for all team members for February" [*Id.*].

In doing so, Hiers and Dover sought "to make sure that no other employees were participating in the same activity" [Doc. 69-4 at 20 (Hiers Dep. 74:2-4)]. They "divided and conquered" by searching the American Express automated phone number in the software system [*Id.* at 32 (Hiers Dep. 121:16-18); *see also* Doc. 69-5 at 14 (Dover Dep. 52:13-20, 83:24-25)]. They "investigated every single person on the [CAM] team" to be "consistent across the entire team" [Docs. 69-4 at 20 (Hiers Dep. 74:2-16); 69-5 at 16 (Dover Dep. 59:13-14)]. On February 24, 2017, Dover emailed Heath that Dover "r[a]n a report across all CAM Knoxville back to Jan 1 2017" and saw the American Express automated phone number "dialed repeatedly" by Plaintiff and Charles Griffith [Doc. 57-14 at 2-4]. He sent Heath a screenshot of Plaintiff's twenty-four (24) outgoing calls to the American Express automated phone number and Griffith's twenty (20) outgoing calls to the American Express automated phone number [*Id.*]. Heath stated "[n]o other CAMs have dialed this number in 2017" [*Id.*; *see also* 69-15 at 4 (Def.'s Admission)]. After receiving this information, Heath conferred with other individuals in human resources; those individuals were "comfortable with considering the option of termination" because "it appear[ed] that the CAM employees were[] 'padding' their outbound calls to reach their daily outbound call volume" and "misrepresenting their [key performance metric]" [Doc. 57-21 at 3-4].

On February 27, 2017, Defendant fired Plaintiff—along with Coile, Fleece, and Griffith— for "misrepresenting calls and ethics violation" related to "calls being made to [the American Express automated phone] number over a period of a month" [Docs. 69-5 (Dover Dep. 55:11-13); 57-30 at 9 ("Plaintiff had violated U.S. Bank's Code of Ethics by falsifying her outbound call volume, which is not considered satisfactory job performance."), 25 (termination classified as

8

"I-misconduct/violation of pol"); 69-4 at 16 (Hiers Dep. 60:23-24)].  In a meeting, Hiers and Dover informed Plaintiff of "what [they] had identified," specifically that Plaintiff called an "American Express number that didn't speak back" "to boost [her] numbers" [Docs. 69-5 at 19 (Dover Dep. 69:1-7); 57-1 at 17 (Jan. 24, 2022 Goodale Dep. 60:7-18)].  Dover asked Plaintiff, "what are you doing here, why are you making these calls" [Doc. 69-5 at 19 (Dover Dep. 69:2-3)].  Plaintiff "identified the number as a tool/resource available to all Elavon and that the calls were being made as an attempt to convert AMEX payment customers to Elavon Payment Solutions . . . [which] was condoned by Greg [Hiers] and was sent to Chris Dover in her weeklys" [Doc. 57-21 at 6].

CAMs reporting to Hiers provided him a weekly report of "daily and monthly activities; phone calls, customer issues, [and] escalations" [Doc. 57-2 at 21 (Jan. 26, 2022 Goodale Dep. 80:1-10); *see also* Docs. 57-11 at 33 (Hiers Dep. 127:20-128:1); 57-1 at 11 (Jan. 24, 2022 Goodale Dep. 36:21-22)].  At her deposition, Plaintiff explained that her "weekly reports" (1) "documented all [her] calls to American Express," (2) "why [she] called American Express," and (3) "pretty much had most of [her] conversations" [Doc. 57-1 at 21 (Jan. 24, 2022 Goodale Dep. 75:15-19)].  Hiers would "glean" certain information from the weekly reports "to send up" to others at Elavon [Doc. 57-11 at 33-34 (Hiers Dep. 127:25-128:1)].  Dover testified that "the weekly reports that [Plaintiff] sent to Greg [Hiers] didn't necessarily make it to" him [Doc. 57-25 at 18 (Dover Dep. 66:1-3)].

In the meeting on February 27, 2017, Plaintiff told Hiers "to interject and let [Dover] know that we've already talked about the kind of calls that I'm making here.  You need to let him know that it's okay" [Docs. 57-1 at 21 (Jan. 24, 2022 Goodale Dep. 79:22-24)].  Hiers "shared that he was aware of the practice, but not the volume in which these employees were calling this outbound number" [Doc. 57-17 at 2].  Dover terminated Plaintiff, who was sixty-one (61) years old at the

9

time [Docs. 69-5 19 (Dover Dep. 69:12-13); 57-30 at 17]. Plaintiff's separation notice described the circumstances leading to termination as "misrepresent[ing] her outbound call efforts" by "repeatedly call[ing] a voice mail service to artificially inflate h[er] outbound calls," which "is not consistent with the US Bank Code of Ethics (Specifically conducting business fairly, responsibly, and ethically)" [Doc. 69-22 at 2].

On February 28, 2017, after her termination, Plaintiff called a U.S. Bank ethics and compliance hotline, stating that she should have been told that "making calls to clients for retaining their business" "was not something to do" and that "other employees were calling the numbers that she was terminated for but was told that because they did not call as much as [she did], they were not being terminated" [Doc. 57-6 at 1 (Ethics and Compliance Hotline)]. Plaintiff stated that she called the American Express automated phone number "[t]o verify the number and [to ensure] the information that's programmed in that number matches everything in both systems" [Doc. 57-1 at 18 (Jan. 24, 2022 Goodale Dep. 63:15-17)]. She "d[id] not know why she was singled out" [Doc. 57-6 at 1]. She also reported that in February 2017, Dover "curs[ed] at the team during a meeting" in a way that she "perceived [as] threatening about team member positions," including "her day to day duties" [Id.]. She did not mention her age [See generally id.].

On April 28, 2017, Heath notified Plaintiff that "there were no findings of ethics violations" after the team concluded that Plaintiff, Coile, Fleece, and Griffeth were fired for being "unproductive" [Docs. 57-1 at 36 (Jan. 24, 2022 Goodale Dep. 136:14-19); 57-2 at 22 (Jan. 26, 2022 Goodale Dep. 82:21-22); 57-22 at 2-4 (Goodale Ethics Issue Response Form)].

In her deposition, Plaintiff testified that at least two (2) other CAMs—Jeana Coatney and Jennifer Weaver—also "talked about [how] they were using [the American Express automated phone number]" [Doc. 57-1 at 20 (Jan. 24, 2022 Goodale Dep. 71:10-11)]. They told Plaintiff that

10

they were "concerned" because Plaintiff and others were "released" because they were calling the American Express automated phone number [*Id.* (Jan. 24, 2022 Goodale Dep. 71:11-12)]. Coatney and Weaver both reported to Hiers [Doc. 69-4 at 43, 46 (Hiers Dep. 168:13-14, 177:18-19)]. While Coatney had been hired as a CAM 2 on December 31, 2015, she changed positions to a "credit review specialist 2" as of October 16, 2016 [Doc. 57-30 at 22]. In February 2017, Coatney was forty-three (43) years old [*Id.* at 1]. In contrast, Weaver, who was thirty-seven (37) years old in February 2017, was a CAM 2 like Plaintiff [*Id.* at 19, 33]. Plaintiff specifically testified that Weaver "said she used the 800 AMEX number as well. And I don't know if she used it proactively or not, but we explained how I know I explained how I used it proactively, to make sure all numbers matched in everybody's systems and that was the way to do it" [Doc. 57-2 at 16 (Jan. 26, 2022 Goodale Dep. 58:21-59:1)].

## B. Procedural Background

Plaintiff filed an initial charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on August 30, 2017 [Doc. 57-7 at 1]. And she amended that charge on September 29, 2017 [Doc. 57-8 at 1]. In the amended charge, Plaintiff alleged that Defendant terminated her and took other unlawful actions because of her age and "in retaliation for making an internal complaint" [*Id.* at 2]. The amended charge provided sixteen (16) bases for the charge [*See id.* at 5]. The EEOC uploaded Plaintiff's amended charge of discrimination to Defendant's internal system on October 6, 2017, and it was viewed on October 10, 2017 [Docs. 82-1 at 4; 82-2 at 2]. After investigation, the EEOC issued a right to sue letter on July 19, 2019 [Doc. 1-2 at 1].

On October 16, 2019, Plaintiff filed this suit against Defendant, alleging that Defendant's actions violated the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et seq.* Plaintiff's Complaint appears to allege three (3) discrete forms of age discrimination. ***First***,

11

Plaintiff alleges a wage claim related to "younger employees [who] were ultimately paid more than her" even though she "ha[d] more experience in the industry, more tenure with Defendant, and perform[ed] either the same or increased job duties" [Doc. 1 ¶¶ 34, 40]. **Second**, Plaintiff alleges an unlawful termination claim [*Id.* ¶ 41]. And **third**, Plaintiff alleges a retaliation claim because "her employment was involuntarily terminated" "due to her making complaints of age discrimination" "to Andy Popwell, the group [V]ice [P]resident" about "younger representatives" receiving "better reviews over her when it was not warranted" [*Id.* ¶¶ 28, 41].

On April 22, 2022, Defendant filed a motion for summary judgment [Doc. 55], asserting that each of Plaintiff's claims fails as a matter of law [*See* Doc. 56]. Plaintiff responded in opposition to the motion for summary judgment [Doc. 73]. And she separately filed a "Motion for Spoliation Sanctions" [Doc. 71], asking the Court to "impose spoliation sanctions for Defendant's apparent destruction of critical evidence" by (1) "presenting a 'missing evidence rule' special jury instruction at the trial" and (2) "apply[ing] that rule" at summary judgment—purportedly creating a "rebuttable presumption as to pretext" [Doc. 71 at 1-2, 12, 15].

Plaintiff's Motion for Spoliation Sanctions addresses two (2) items of "critical evidence" that Defendant purportedly destroyed [Docs. 71 at 6; 85 at 8].[2] **First**, she addressed the physical "weekly reports" that Plaintiff provided to Hiers that purportedly "disclose in detail that she was making the AmEx calls" and that "would show that the reason Defendant gave for firing the Plaintiff is absolutely false" [*Id.* at 7, 12]. **Second**, she addressed "transmittal and/or forwarding email(s)" of human resources "summaries" of the events leading up to Plaintiff's termination that

---

[2] Plaintiff's Motion initially addressed "six (6) items of critical evidence" for which she sought sanctions [Doc. 71 at 6]. However, in her Reply, Plaintiff stated that she "withdraws her motion" as to four (4) previously identified items of evidence because they were "somewhat tangential" [Doc. 85 at 8].

Plaintiff asserts "were written by two different people as a way to choreograph the outcome of the investigation that had not yet started" [*Id.* at 7, 14]. Plaintiff requested both items from Defendant during discovery, but Defendant alleged that it "conducted a diligent search and ha[d] not located any responsive documents" [Doc. 69-17 at 6]. Defendant opposed Plaintiff's "Motion for Spoliation Sanctions," asserting that the requested evidence "never existed, w[as] never requested, or w[as] destroyed pursuant to routine retention schedules before Defendant ever had notice of [Plaintiff's] potential claims" [Doc. 81 at 2]. In support, Defendant filed a sworn affidavit of one of its attorneys identifying Defendant's "limited retention of email records, general administrative information, and schedules" that was "ninety days past the creat[ion] of the document" [Doc. 82 at 1]. Defendant also requested "fees and costs incurred" in responding to Plaintiff's "Motion for Spoliation Sanctions" [*See* Doc. 81 at 12].

## II.    Analysis

### A.    Plaintiff Has Failed to Demonstrate That Spoliation Sanctions Are Appropriate.

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in ***pending or reasonably foreseeable litigation***." *Billiter v. SP Plus Corp.*, 329 F. Supp. 3d 459, 465-66 (M.D. Tenn. 2018) (emphasis added). "[F]ederal law, rather than state law, governs spoliation sanctions during litigation in federal courts." *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009). If spoliation has occurred, the Court retains discretion regarding (1) whether to impose sanctions and (2) if so, what sanctions to impose. *See id.* at 651. Plaintiff does not provide a particular legal basis for the sanctions requested [*See generally* Doc. 71]. As the party seeking sanctions, Plaintiff bears the burden of demonstrating the propriety of sanctions. *Byrd v. Alpha All. Ins. Corp.*, 518 F. App'x 380, 384 (6th Cir. 2013).

13

For spoliation to exist, the allegedly offending party must have had an obligation to preserve the evidence at issue. For the hard copy "weekly reports," "a party seeking an adverse inference instruction" as a spoliation sanction "must establish (1) that the party having control over the evidence **had an obligation to preserve it at the time it was destroyed**; (2) that the records were destroyed 'with a culpable state of mind'; **and** (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Beaven v. U.S. Dep't of Just.*, 622 F.3d 540, 553 (6th Cir. 2010) (emphasis added) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)). And as to the electronic "transmittal and/or forwarding email(s)" of Human Resources' "summaries," the Court may order sanctions under Federal Rule of Civil Procedure 37 where "electronically stored information that **should have been preserved in the anticipation or conduct of litigation** is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e) (emphasis added).

A duty to preserve evidence arises where a party "has notice that the evidence is relevant to litigation or . . . should have known that the evidence may be relevant to future litigation." *John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008). "[T]riggering events" "are typically limited to demand letters, preservation requests, threats of litigation, or a party's decision to pursue a claim." *Black v. Costco Wholesale Corp.*, 542 F. Supp. 3d 750, 753 (M.D. Tenn. 2021); *see Ross v. Am. Red Cross*, 567 F. App'x 296, 302-03 (6th Cir. 2014) (no obligation to preserve evidence from September 2008 where defendant was unaware of potential litigation before March 2009).

Plaintiff has not demonstrated that Defendant had an obligation to preserve either the (1) hard copy "weekly reports" or (2) electronic "summaries" at the relevant time, beyond

14

Defendant's standard ninety-day (90-day) retention policy. A March 1, 2017 Report details Plaintiff's February 28, 2017 call to U.S. Bank's Ethics and Compliance Hotline about her termination and Dover's "demeaning and unprofessional tone" [*See* Doc. 57-6 at 1]. The call led to a broader ethics investigation that concluded on April 28, 2017 [Docs. 57-15 at 10-11 (Heath Dep. 36:20-24, 38:19-39:10); 57-22 at 2 (Ethics Issue Response Form)]. Plaintiff's call was not a "triggering event" that would have placed Defendant "on notice" to retain the "weekly reports" or "summaries" for potential future age discrimination litigation. *See Ross*, 567 F. App'x at 302-03; *Black*, 542 F. Supp. 3d at 753. The Report summarizing Plaintiff's call did not contain ***any*** mention of potential age discrimination or litigation [*See generally* 57-6]. Instead, Plaintiff reported that Dover "curs[ed] at the team during a meeting" and "display[ed] a demeaning and unprofessional tone" that she perceived as "threatening" and "intimidat[ing]," and that left her unable to "voice her concerns" [*Id.* at 2]. Plaintiff also reported that Dover "should have notified her that [making the calls] was not something to do" and that "other employees were calling the numbers that she was terminated for" but "because they did not call as much as [her], they were not being terminated" [*Id.*]. As a result, Plaintiff stated that (1) "her morale has been negatively impacted," (2) she "would like her information regarding her unfair termination reviewed," and (3) "she would like her job back" [*Id.*]. None of these complaints placed Defendant on notice that it needed to retain documents for future litigation by Plaintiff related to age discrimination, let alone the specific documents that Plaintiff now claims were unlawfully destroyed. *See Ross*, 567 F. App'x at 302-03; *Nye v. CSX Transp., Inc.*, 437 F.3d 556, 569 (6th Cir. 2006) (concluding that the disposal of documents consistent with an established retention policy before any case was filed or discovery request was made was not spoliation). And Plaintiff filed her amended charge of discrimination with the EEOC on September 29, 2017, five (5) months after the ethics

15

investigation concluded and well beyond Defendant's ninety-day (90-day) retention policy for "email records [and] general administrative information" like the "summaries" or "weekly reports" [*See* Docs. 57-8 (Notice of Charge); *see also* Doc. 82-1 at 4 (October 6, 2017 upload date in Elavon, Inc. EEOC system)].[3] *See Nye*, 437 F.3d at 569.

Plaintiff has failed to establish that Defendant had an obligation to preserve the two items of "critical evidence" at issue in her motion. In light of Defendant's standard retention policy, no spoliation sanction is warranted. *See Nye*, 437 F.3d at 569. Accordingly, the Court **DENIES** Plaintiff's "Motion for Spoliation Sanctions" [Doc. 71]. However, because Plaintiff did not act "in bad faith, vexatiously, wantonly, or for oppressive reasons," the Court denies Defendant's request for an order awarding its fees and costs in responding to Plaintiff's motion [*See* Doc. 81 at 12]. *See NPF Franchising, LLC v. SY Dawgs, LLC*, 37 F.4th 369, 383-84 (6th Cir. 2022) (quoting *Big Yank Corp. v. Liberty Mut. Fire Ins. Co.*, 125 F.3d 308, 313 (6th Cir. 1997) (addressing a district court's inherent authority to impose sanctions)).

### B.     Defendant's Motion for Summary Judgment

Under Federal Rule of Civil Procedure 56, the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the facts in the light most favorable to the non-moving party and make all reasonable inferences that can be drawn from those facts. *Matsushita*, 475 U.S. at 587; *Nat'l Satellite Sports*, 253 F.3d at 907. The moving party bears the burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party has met this burden, the non-moving

---

[3] Plaintiff filed her initial charge with the EEOC on August 30, 2017 [Doc. 57-7 at 1]. But the record does not show that this initial charge was relayed to Defendant.

16

party cannot "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita*, 475 U.S. at 586); *see also* Fed. R. Civ. P. 56(c)(1). A dispute over a material fact is only a "genuine issue" if a reasonable jury could find for the nonmoving party on that issue. *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Summary judgment must be entered where a party "fails to make a showing sufficient to establish the extent of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The ADEA prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). "[T]he ADEA's 'because of' language requires that a plaintiff 'prove by a preponderance of the evidence (which may be direct or circumstantial) that age was the "but-for" cause of the challenged employer decision.'" *Scheick v. Tecumseh Pub. Schs.*, 766 F.3d 523, 529 (6th Cir. 2014) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009)). A plaintiff may bring an ADEA claim based on direct or circumstantial evidence of discrimination. *Flowers v. WestRock Servs., Inc.*, 979 F.3d 1127, 1130 (6th Cir. 2020). Direct evidence "requires the conclusion that age was the 'but for' cause of the employment decision." *Scheick*, 766 F.3d at 530. Circumstantial, or indirect, evidence "requires the factfinder to draw inferences from the evidence presented to conclude that the plaintiff was terminated based on age." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021).

Plaintiff attempts to prove her ADEA claims through circumstantial evidence [*See* Doc. 73 at 16]. As a result, the *McDonnell-Douglas* burden-shifting framework governs each claim. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *Miles v. S. Cent.*

17

*Hum. Res. Agency, Inc.*, 946 F.3d 883, 887 (6th Cir. 2020). Under this framework, as a first step, Plaintiff must establish a prima facie case of discrimination by a preponderance of the evidence. *See Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981); *Pelcha*, 988 F.3d at 325. If Plaintiff does so, the burden of production shifts to Defendant at step two to articulate a legitimate, non-discriminatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802; *Pelcha*, 988 F.3d at 325. And if Defendant meets this burden, the burden shifts back to Plaintiff at step three to prove by a preponderance of the evidence that Defendant's proffered non-discriminatory reason for its actions is pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804; *Flowers*, 979 F.3d 1130.

### i. Plaintiff Has Not Established a Prima Facie Case of Age-Based Wage Discrimination.

As an initial matter, Plaintiff has clarified that her wage claim applies to "what she was [paid] from and after December 3, 2016" [Doc. 73 at 31]. Therefore, to the extent that Plaintiff's Complaint could be read to attempt to raise a wage claim under the ADEA based on any conduct before December 3, 2016, Plaintiff has knowingly and voluntarily abandoned such a claim. *See Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 564 n.1 (6th Cir. 2021); *see also Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (affirming district court's conclusion that plaintiff abandoned claims when she expressly declined or simply failed to address them in her response).

A plaintiff must file a charge of age discrimination with the EEOC "within 300 days after the alleged unlawful practice occurred" "in a State which has a law prohibiting discrimination in employment because of age and establishing or authorizing a State authority to grant or seek relief from such discriminatory practice." *See* 29 U.S.C. §§ 626(d), 633(b). Tennessee is one such state.

*See* Tenn. Code Ann. § 4-21-407; *Jackson v. Richards Med. Co.*, 961 F.2d 575, 578-79 (6th Cir. 1992). For Plaintiff's wage claim to be timely, then, she must have filed a charge within 300 days of the conduct leading to the charge. *See* 29 U.S.C. § 626(d); *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 375-76 (6th Cir. 2002). Plaintiff filed her amended charge, which included her wage claim, on September 29, 2017 [Doc. 1-1]. The wages that she made on or after December 3, 2016 fall within 300 days of that date. Therefore, her wage claim, as clarified, is timely. *See* 29 U.S.C. § 633(b).

Plaintiff also exhausted her administrative remedies as to the content of her wage claim. Defendant asserts that Plaintiff "did not allege facts in her charge to suggest that she was discriminated against with respect to her pay," so the EEOC was not prompted "to investigate any claims related to disparate pay" [Doc. 56 at 11]. In an ADEA case, the complaint that a Plaintiff ultimately files in federal court "must be limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." *Weigel*, 302 F.3d at 380. But where facts related to the charge "would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim." *Id.* (quoting *Davis v. Sodexho, Cumberland Coll. Cafeteria*, 157 F.3d 460, 463 (6th Cir. 1998)). In her amended charge, Plaintiff alleged that Defendant "engaged in unlawful material adverse actions" including that "[y]ounger employees were ultimately paid more than [her], result[ing] in up to 25% raises" and "[y]ounger new employees were given better . . . raises over [her]" [Doc. 1-1 at 6]. Plaintiff's discrimination claim regarding wages from December 3, 2016 to February 27, 2017 could "reasonably be expected to grow out of" the amended charge Plaintiff filed. *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 254 (6th Cir. 1998). As such, Plaintiff has exhausted the administrative remedies for her wage claim. *See Weigel*, 302 F.3d at 380.

19

However, Plaintiff has not established a prima facie case of wage discrimination under the ADEA. Plaintiff must put forth facts showing "(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination." *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002)). Circumstances supporting an inference of discrimination include "when the employer replaced the plaintiff with a younger employee and when the employer 'treated similarly situated, non-protected employees more favorably.'" *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 808 (6th Cir. 2020) (quoting *Mickey v. Zeidler Tool & Co.*, 516 F.3d 516, 521-22 (6th Cir. 2008)). It is undisputed that Plaintiff was at least forty (40) years old during the relevant time period—she was sixty-one (61)—making her a member of a protected group [Docs. 56 at 13 n.6; 73 at 6; *see also* Doc. 57-30 at 17]. *See* 29 U.S.C. § 631(a). Neither Party specifically addressed Plaintiff's qualifications for the wage increase she sought [*See generally* Docs. 56; 73; 80]. But viewing the record in the light most favorable to Plaintiff, she was qualified for the position that she held: Dover and Hiers testified that before Plaintiff's American Express automated phone number calls were discovered, Plaintiff was "satisfactorily doing [her] job," [Doc. 69-5 at 12 (Dover Dep. 41:24-42:1-2)], clients liked her, [Doc. 69-4 at 56 (Hiers Dep. 217:6)], and the year prior, she had completed 98% of her outbound call goals, [Doc. 57-5 at 4]. *See Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575-76 (6th Cir. 2003) (en banc) (listing as relevant factors experience and demonstrated possession of the required general skills). This leaves only the third and fourth prima facie elements in dispute.

As to the third element, Plaintiff has failed to point to evidence showing that ***she*** received less pay from December 3, 2016 onward. Plaintiff's pleading broadly argues that "younger

20

workers are unquestionably paid more than older workers" [Doc. 73 at 32]. Receiving less wages can be an adverse employment action, *see Hollins v. Atl. Co.*, 188 F.3d 652, 662 (6th Cir. 1999), but Plaintiff has not cited to evidence in the record supporting that *she* was paid less from December 3, 2016 onward either as a straight accounting matter or as compared to other "younger workers" [*See generally* Doc. 73]. By failing to do so, she has not "set forth specific facts showing that there is a genuine issue for trial." *See* Fed. R. Civ. P. 56(e).

Relatedly, Plaintiff has not presented evidence in support of the fourth element that a similarly situated employee received more pay than Plaintiff. To do so, she must present evidence of a "comparator" who is similar to Plaintiff "in all of the relevant aspects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). The "relevant factors include the skill, effort, and responsibilities of each job and the working conditions under which each job is performed." *Mickey*, 516 F.3d at 522 (quoting *Conti v. Universal Enter., Inc.*, 50 F. App'x 690, 699 (6th Cir. 2002)). Where a non-moving plaintiff fails to point to specific facts in the record establishing a similarly situated employee, she fails to support this element of her prima facie case. *See id.* (concluding there was no wage discrimination where plaintiff and a comparator "performed different roles in the company"); *see also Carey v. Foley & Lardner LLP*, 577 F. App'x 573, 582 (6th Cir. 2014) (concluding there was no wage discrimination where plaintiff "presented no evidence regarding the kinds of duties and responsibilities that any other [comparator] performed"). Here, Plaintiff has not identified a similarly-situated CAM 2 in Hiers's management group, or even under Dover's management, who was paid more than her or was treated more favorably with respect to wage from December 3, 2016 to February 27, 2017.[4] And the graphs

---

[4] For the first time in her response to Defendant's Motion for Summary Judgment, Plaintiff appears to raise a "disparate impact" theory of wage discrimination [*See* Doc. 73 at 32]. But she did not

21

that Plaintiff alleges "highlight differences in pay between younger and older workers," [Doc. 73 at 32], do not identify the salaries of each employee, let alone each employee's skill, effort, responsibilities, and working conditions, [*see generally* Docs. 70-2]. *See Mickey*, 516 F.3d at 522. Under the law, this will not suffice.

At this stage in the litigation, Plaintiff must point to specific facts in the record creating a genuine dispute of material fact or "show[] by affidavit or declaration that, for specified reasons, [she] cannot present facts essential to justify its opposition." *See* Fed. R. Civ. P. 56(d). Plaintiff has not done so. As such, she has failed to demonstrate that a genuine dispute of material fact exists. *See Celotex*, 477 U.S. at 322. Accordingly, Defendant is entitled to judgment as a matter of law on Plaintiff's wage claim. *See* Fed. R. Civ. P. 56.

> ii. **It Is Unclear That Plaintiff Has Established a Prima Facie Case of Unlawful Termination. But Even If She Has, Defendant Offered a Legitimate, Non-Discriminatory Reason, and Plaintiff Has Not Demonstrated Pretext.**

To establish a prima facie case of unlawful termination based on age discrimination, Plaintiff must demonstrate "(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination." *Blizzard*, 698 F.3d at 283 (quoting *Swierkiewicz*, 534 U.S. at 510). It is undisputed that Plaintiff was a member of a protected group when terminated—she was sixty-one (61) years old—and that she was subject to an adverse employment action—she was terminated [Docs. 56 at 13 n.6; 73 at 6; 57-30 at 17]. *See* 29 U.S.C. § 631(a); *Willard*, 952 F.3d at 808.

---

raise this theory in her Complaint [*See generally* Doc. 1]. "Plaintiffs cannot . . . amend their complaint in an opposition brief." *See Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483 (6th Cir. 2020) (citations omitted). Accordingly, the Court cannot and does not consider this theory to the extent Plaintiff seeks to raise it now.

22

Viewing the facts in the light most favorable to Plaintiff, she was also "qualified" for her CAM 2 position prior to the outbound calls she made to the American Express automated phone number. The "qualification" element "focus[es] on a plaintiff's objective qualifications" for the relevant job. *Wexler*, 317 F.3d at 575. Defendant argues that Plaintiff was not qualified as a matter of law because she inflated her outbound calls. But under *McDonnell Douglas*, the Court's evaluation of the prima facie case "must be conducted independently of" Defendant's "proffered nondiscriminatory reason" for terminating Plaintiff. *See Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (6th Cir. 2011). Plaintiff "present[ed] credible evidence that . . . her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field." *Wexler*, 317 F.3d at 574. Plaintiff worked for Defendant for thirteen (13) years, [Doc. 56 at 3]; received a "solid performance rating" in 2016, [Doc. 57-30 at 73, *see also* Doc. 57-5]; was "promoted to public sector customer account manager," [Docs. 73 at 8; 57-1 at 11 (Jan. 24, 2022 Goodale Dep. 37:17-24)]; and Hiers could not recall any specific performance issues before Plaintiff made outbound calls to the American Express automated phone number, [Docs. 73 at 13; 57-11 at 17 (Hiers Dep. 63:7-13)]. *See Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014); *Hale v. ABF Freight Sys., Inc.*, 503 F. App'x 323, 333 (6th Cir. 2012).

But it is unclear whether Plaintiff has sufficiently identified facts demonstrating "circumstances that support an inference of discrimination." *See Blizzard*, 698 F.3d at 283. Plaintiff's lone argument in support of this element of her prima facia case is that "[s]imilarly situated non-protected employees were treated more favorable, in that younger people who made the same calls to the AmEx number were not investigated, let alone terminated" [Doc. 73 at 17]. An inference of discrimination can arise where a defendant "treated similarly situated, ***non-protected employees*** more favorably." *Willard*, 952 F.3d at 808 (quoting *Mickey*, 516 F.3d at 521-

23

22 (emphasis added)).  And at least two cases from the United States Court of Appeals for the Sixth Circuit permitted a plaintiff to prove circumstances that support an inference of discrimination by showing more favorable treatment of "similarly situated *younger* employees" apart from whether that "younger" employee was a member of the protected class.  *See Tschappatt v. Crescent Metal Prods., Inc.*, 798 F. App'x 887, 889 (6th Cir. 2020) (emphasis added); *Moffat v. Wal-Mart Stores, Inc.*, 624 F. App'x 341, 346 n.5 (6th Cir. 2015) ("An ADEA plaintiff need not show that she was treated less favorably than someone outside the protected class.").

To be "similarly-situated," an individual must be "similarly-situated *in all respects*"— "deal[ing] with the same supervisor, hav[ing] been subject to the same standards and *hav[ing] engaged in the same conduct* without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (emphasis added); *see also Ercegovich*, 154 F.3d at 352.  Where "incidents of misconduct giving rise to discipline form the crux of the similarities . . . the degree of their misconduct is a factor to be given great weight."  *Macy v. Hopkins Cnty Sch. Bd. of Edu.*, 484 F.3d 357, 370 (6th Cir. 2007), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012) (en banc).  The acts or misconduct must be of "comparable seriousness."  *Blizzard*, 698 F.3d at 287 (finding alleged comparator's errors "result[ing] in checks being return[ed]" not of comparable seriousness as plaintiff's errors "result[ing] in double payment to vendors").

Plaintiff identified two employees who she believes were similarly situated, non-protected, and treated more favorably—Jennifer Weaver and Jeana Coatney [Doc. 73 at 11, 17].  But Plaintiff was not similarly situated to Weaver or Coatney.  Weaver was a thirty-seven (37) year old CAM 2, reporting to Hiers in February 2017—a good start [Docs. 57-11 at 46 (Hiers Dep. 177:18-19);

24

57-30 at 19, 33]. But at the relevant time, Coatney was a forty-three (43) year old "credit review specialist," not a CAM, who also happened to report to Hiers [Docs. 57-11 at 43 (Hiers Dep. 168:13-14); 57-30 at 16, 22]. Coatney, herself, was part of the same protected class as Plaintiff [Doc. 57-30 at 22]. *See* 29 U.S.C. § 631(a). Digging further into the actions of Weaver and Coatney, Plaintiff relies solely on her own testimony to support her claim that Weaver and Coatney engaged in the "same conduct" as Plaintiff.[5] Plaintiff testified:

> A.   Jennifer Weaver, she's another new person. Jennifer and [Jeana Coatney], they're new-ish, like late 2015, early '16 hires. ***They both talked about they were using [the American Express automated phone number] and they were just concerned that we were released because we were using it***.
> Q.   So they talked to you after you were let go about that?
> A.   Well, [Jeana] did. [Jeana] did and – not [Jeana], but Jennifer, Jennifer did. [Jeana], she talked to me before because she was on my team of back-ups, so she was letting me know all the different things that she was doing and working on. So, yes, she called it, ***Jennifer called it,*** and I don't know who else called it, probably everybody, because, like I said, it was a well-published number and people knew what it was for.

[Doc. 57-1 at 20 (Jan. 24, 2022 Goodale Dep. 71:8-22 (emphasis added))]. Plaintiff further testified "Jennifer said she used the 800 AMEX number as well. And I don't know if she used it proactively or not . . ." [Doc. 57-2 at 16 (Jan. 26, 2022 Goodale Dep. 58:21-23)]. This evidence alone is not enough to create a genuine dispute of material fact.

This record, at most, establishes that Weaver and Coatney "were using" the American Express automated phone number at some point after they were hired in "late 2015, early '16" [Docs. 57-1 at 20 (Jan. 24, 2022 Goodale Dep. 71:9-11); 57-2 at 16 (Jan. 26, 2022 Goodale Dep. 58:21)]. It does not establish when, in what context, or how often Weaver or Coatney "were using" the number. Nor does it establish that Weaver or Coatney reported any calls to the American

---

[5] Neither Party deposed Weaver or Coatney.

25

Express automated phone number as part of any monthly "outbound calls" requirement. Moreover, Hiers and Dover both testified that Defendant's management examined all phone records for the entire CAM team in 2017 and identified only four (4) individuals—not including Weaver and Coatney—who made outbound phone calls to the American Express automated number [*See* Docs. 69-4 at 20 (Hiers Dep. 74:2-16); 69-5 at 16 (Dover Dep. 59:13-14); 69-15 at 4]. Without more, the Court cannot conclude that Weaver or Coatney were similarly situated to Plaintiff without "differentiating or mitigating circumstances" or that their conduct was of "comparable seriousness" to Plaintiff's conduct during the relevant time period. *See Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1116 (6th Cir. 2001) (concluding plaintiff did not show he was "similarly situated" where he "produced no evidence" demonstrating "the severity and frequency" of other employees' alleged misconduct); *Mitchell*, 964 F.2d at 583-84. Thus, Plaintiff has failed to demonstrate that a similarly situated employee was treated more favorably than her. However, this does not end the Court's inquiry.

The Sixth Circuit has recognized that in certain circumstances, "allegedly ageist comments" may be "sufficient to raise a plausible inference of discrimination." *See Pelcha*, 988 F.3d at 326. And viewing the facts in the light most favorable to Plaintiff and drawing all reasonable inferences, the comment Dover allegedly made may fall within those certain limited circumstances. *See id.* But the Court need not decide that issue here. *See E.E.O.C. v. Lucent Techs. Inc.*, 226 F. App'x 587, 591 (6th Cir. 2007). Even if Plaintiff had made a prima facie case, she cannot ultimately demonstrate pretext.

Proceeding to the second step of the *McDonnell-Douglas* analysis, Defendant has articulated a legitimate, non-discriminatory reason for terminating Plaintiff. Defendant asserts that it terminated Plaintiff because she "inflated her outbound call volume by calling the same

26

automated number," resulting in her manager "no longer [being able to] trust her to perform her duties" [Doc. 56 at 15; 69-22 at 2]. This is a clear and reasonably specific reason. *See Burdine*, 450 U.S. at 253; *Blizzard v. Marion Tech. Coll.*, No. 9-CV-1643, 2011 WL 1230997, at *10 (N.D. Ohio Mar. 30, 2011), *aff'd*, 698 F.3d 275 (6th Cir. 2012) (finding not following proper procedures and performing necessary functions sufficient non-discriminatory reasons). Accordingly, Defendant met its burden at step two.

And at step three, Plaintiff has not established that the reason Defendant terminated her was pretextual. Pretext may be shown "directly by persuading the court that ***a discriminatory reason*** more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 254 (emphasis added). A plaintiff can establish pretext by showing, among other things, "that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 539 (6th Cir. 2014) (quoting *Wexler*, 317 F.3d at 576). "To carry her burden in opposing summary judgment, [a plaintiff] must produce sufficient evidence from which a jury could reasonably reject [a defendant's] explanation of why it fired her," *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009), or "articulate some cognizable explanation of how the evidence she has put forth establishes pretext," *Miles*, 946 F.3d at 888.

Plaintiff argues that Defendant's assertion that it terminated her for misrepresenting her outbound calls and losing the trust of her manager has no basis in fact and that her termination was not the product of a "reasonable investigation" [Doc. 73 at 21]. But she has not identified supporting facts and, even viewed in her favor, the facts that are in the record do not support her argument. *See Miles*, 946 F.3d at 888; *Chen*, 580 F.3d at 400. "To show pretext on the ground

27

that the reason for termination had no basis in fact, a plaintiff 'must provide evidence that the employer's allegations never happened'" essentially showing "whether the employer made up its stated reason to conceal intentional discrimination." *Pelcha*, 988 F.3d at 326 (quoting *Miles*, 946 F.3d at 888-89). "The plaintiff's burden at th[is] stage is to show '*both* that the reason was false, *and* that discrimination was the real reason'" for the employer taking action. *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 473 (6th Cir. 2002) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original)).

Plaintiff has not done so. As an initial matter, Plaintiff did not contest either that she made outbound calls to the American Express automated phone number, [Doc. 57-1 at 19 (Jan. 24, 2022 Goodale Dep. 69:14-22)], or that a February 24, 2017 email shows that she made twenty-four (24) outbound calls to the number on one day, [Doc. 57-14 at 16]. Instead, Plaintiff asserted that the outbound calls to the American Express automated phone number had a legitimate business purpose and that she "did get the blessings" of Hiers to make calls to the number [Doc. 57-1 at 18 (Jan. 24, 2022 Goodale Dep. 63:15-17, 64:18-19)]. Plaintiff also stated that her outbound calls to the American Express automated phone number were "documented in [her] weekly reports and [her] separate American Express reportings" [*Id.* (Jan. 24, 2022 Goodale Dep. 65:21-23)]. But Dover, the ultimate decision-maker, testified that he did not necessarily receive these weekly reports, and there is no evidence to the contrary [*See* Doc. 57-25 at 18 (Dover Dep. 66:1-3)]. And Plaintiff admitted that it "would be wrong" to make outbound calls to an automated number to "drive up the numbers" of outbound calls [Doc. 57-1 at 20 (Jan. 24, 2022 Goodale Dep. 70:5-13)].

Plaintiff did not provide evidence showing that **Dover**, the decision-maker, knew about, let alone approved, the volume of outbound calls that she made to the American Express automated number. And, as the decision-maker, Dover concluded that the volume of Plaintiff's calls to the

28

American Express automated phone number was too high [*See* Doc. 57-25 at 14 (Dover Dep. 51:24-52:9)].  Because Dover, not Hiers, was the decision-maker regarding Plaintiff's termination, Hiers's alleged knowledge of the fact that Plaintiff had made outbound calls to the American Express automated phone number does not create a genuine dispute of material fact as to whether Defendant's proffered reason to terminate Plaintiff was pretextual.  *See Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 83 (6th Cir. 2020) (clarifying that the decision-maker's knowledge forms the pertinent inquiry).

Additionally, the undisputed portions of the record support Defendant's reason for termination.  Even before the audit, Defendant's management told CAMs the importance of "not making any kind of erroneous dials that would artificially inflate your call numbers" [Doc. 57-25 at 11 (Dover Dep. 39:9-13, 40:5-7)].  And contemporaneous emails reflect the audit and discussion about the impropriety of making this volume of calls to the same number [*See* Docs. 57-12; 57-17; 57-14 at 4; *see also* Doc. 73 at 19 n.6 ("[A]ll three [managers] agree that the volume of calls is not within best practices." (quoting Doc. 57-12 at 1))].  *See Hendershoot v. St. Luke's Hosp.*, No. 20-3128, 2020 WL 6256869, at *2 (6th Cir. 2020) (concluding termination had a basis in fact where "[a]ll of the allegations included in the disciplinary action [we]re supported by evidence in the record"); *Loyd*, 766 F.3d at 591 (concluding termination had a basis in fact where employer offered "contemporaneous witness statements" that "corroborate[d] the substance of the discharge notice").  Plaintiff argues that the allegedly improper twenty-four (24) outbound calls that she made to the American Express automated phone number were only a small portion of her required call volume for the month, but "while [plaintiff] may feel [the reasons defendant gave for the termination] to be unfair, they are not unreasonable."  *Blizzard*, 2010 WL 1253089, at *11.  The ADEA is not a vehicle to challenge the propriety of every decision made by an employer—"an

29

'employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'" *Miles*, 946 F.3d at 886 (quoting *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984)). Plaintiff has therefore not met her burden to demonstrate that Defendant's reason for terminating her had no basis in fact. *See Pelcha*, 988 F.3d at 326.

But what of Dover's alleged comment? At the third step of the *McDonnell-Douglas* framework, it does not create a genuine dispute as to pretext. The Court evaluates allegedly ageist comments by examining "(1) whether the statements were made by a decision-maker or by an agent within the scope of his employment; (2) whether the statements were related to the decision-making process; (3) whether the statements were more than merely vague, ambiguous or isolated remarks; and (4) whether they were made proximate in time to the act of termination." *Peters*, 285 F.3d at 478. Viewing the facts in the light most favorable to Plaintiff, Dover made the comment at some point after October 2016 but before January 2017 at a team meeting with all CAMs [*See* Doc. 57-1 at 33-35 (Jan. 24, 2022 Goodale Dep. 124:13-126:14, 131:20-21)]. There is no evidence that this alleged single, stray comment was directed at Plaintiff or connected in any way to the investigation of Plaintiff's outbound calls to the American Express automated phone number on February 24, 2017, let alone Dover's ultimate decision to terminate Plaintiff on February 27, 2017. *Compare Anderson v. Target Stores, Inc.*, No. 21-5620, 2022 WL 1044042, at *7 (6th Cir. Apr. 7, 2022) (concluding that a decision-maker telling "another employee that she planned to replace [plaintiff] with a younger person" did not create a genuine dispute where the statement was "unrelated to the termination decision") *and Pelcha*, 988 F.3d at 327 (concluding that "isolated and sparse" statements that another employee had a "limited shelf life" and was past her "expiration date" did not create a genuine dispute where the statements were "not directed

30

towards" plaintiff and were "not made in connection with any termination decision"), *with Willard*, 952 F.3d at 813 (concluding that "overtly negative comments about [plaintiff's] age," including that plaintiff was "over-the-hill," "old and fat," and "too old to sit at a front desk" made "within a week" of plaintiff's termination "evinced a desire that [plaintiff] should leave"). Dover's alleged comment and the facts that Plaintiff has identified regarding its context do not demonstrate pretext.

Plaintiff also suggests—without substantiating—several other circumstances that suggest pretext: (1) "disparate treatment" related to Weaver and Coatney—the two alleged comparators who, for the reasons stated above, were not similarly situated to Plaintiff; (2) "disciplinary history as it relates to termination"; (3) a "pre-ordained investigation report"; (4) "a cover-up to create the illusion of reasonableness"; (5) that Heath "admitted the reason [for Plaintiff's termination] was unfounded" in a call to Coile when he told Coile that "there was no ethics violation"; (6) "misleading" statements made by counsel in Defendant's 2022 Motion for Summary Judgment; and (7) "the wealth of missing evidence" referenced in Plaintiff's spoliation motion [Doc. 73 at 21-27]. Aside from conclusory assertions in her briefing, Plaintiff has not attempted to establish any of these alleged events with facts in the record, as is her burden, nor has she explained why these circumstances are probative of pretext. *See Peters*, 285 F.3d at 473; *Provenzano*, 663 F.3d at 818. Accordingly, even if Plaintiff could establish a prima facie case, she could not ultimately establish pretext. Therefore, summary judgment is appropriate.

### iii. Although Plaintiff Sufficiently Pled a Retaliation Claim, She Has Not Established a Prima Facie Case of Retaliation.

In its motion for summary judgment, Defendant first argues that Plaintiff has not sufficiently pled her retaliation claim. But she has met that initial requirement. Rule 8 requires that a plaintiff set forth "a short and plain statement of the claim showing that the pleader is entitled

to relief." Fed. R. Civ. P. 8(a)(2). A complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Under the ADEA, it is "unlawful for an employer to discriminate against any of his employees . . . because such an individual . . . has opposed any practice made unlawful by this section." 29 U.S.C. § 623(d). In her Complaint, Plaintiff alleged that (1) she "made [a] complaint to Andy Popwell, the group vice president" that "she was receiving biased treatment because of her age" and (2) she was "retaliated against due to her making complaints of age discrimination, when her employment was involuntarily terminated" [Doc. 1 ¶¶ 28, 39, 41]. These facts set forth "a short and plain statement of the claim." *See* Fed. R. Civ. P. 8(a)(2). And the Complaint contains "enough facts to state a claim to relief that is plausible." *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570; *O'Bryan v. US Bank Nat'l Ass'n*, No. 20-CV-153, 2020 WL 4753844, at *8-9 (M.D. Tenn. Aug. 17, 2020) (finding as sufficient allegations that plaintiff "complained that she was being treated differently than the younger employees" and her manager "work[ed] with others to orchestrate [plaintiff's] termination" resulting in a "wrongful[] terminat[ion]"). Accordingly, Plaintiff has pled a retaliation claim. But proving a claim at summary judgment requires more.

Plaintiff's claim fails at summary judgment because she cannot establish a prima facie case of age-based retaliation. The familiar *McDonnell-Douglas* framework also applies to Plaintiff's retaliation claim. *See Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008). To establish a prima facie case of retaliation under the ADEA, Plaintiff must show that (1) she engaged in a protected activity, (2) the defendant knew of the protected activity, (3) the defendant took an adverse employment action against her, and (4) there was a causal connection between the protected activity and the adverse employment action. *See Mickey*, 516 F.3d at 523.

Plaintiff's case fails at the first and second elements. As an initial matter, Plaintiff's response to Defendant's motion for summary judgment did not contest Defendant's assertions that Plaintiff's conduct did not amount to protected activity [*See generally* Doc. 73 at 28-30]. And the undisputed record also shows that her complaints did not amount to a protected activity. "A plaintiff's objection to an employment practice is protected activity if her supervisors 'should have reasonably understood that [she] was making a complaint of [age] discrimination.'" *Mumm v. Charter Twp. of Superior*, 727 F. App'x 110, 112 (6th Cir. 2018) (quoting *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 512 (6th Cir. 2016)). Protected activity is an "overt stand against suspected illegal discriminatory action," *Blizzard*, 698 F.3d at 288, not "a vague charge of discrimination," *Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007). Plaintiff's purported protected activity is (1) complaints to Miller in 2016 about a raise that she did not receive[6] and (2) complaints to Popwell about (a) a ranking she received that was less than one of her trainees and (b) "escalations" that she handled [*See* Doc. 57-1 at 24-26, 30-31 (Jan. 24, 2022 Goodale Dep. 86:15-87:14, 87:22-88:18, 93:11-94:23, 113:4-114:4)].[7] Plaintiff's general work-related complaints do not amount to complaints of age discrimination, and she has not presented evidence that would allow the Court to infer that Miller and Popwell would have understood them as such. Plaintiff's complaints did not connect the raise that she did not receive, the lower ranking that she

---

[6] Plaintiff's Complaint only alleges complaints that she made to Popwell as the basis for her claim [*See* Doc. 1 ¶ 28]. But out of an abundance of caution and to Plaintiff's benefit, the Court analyzes Plaintiff's complaints made to Miller as well.

[7] To the extent Plaintiff seeks to rely on a group conversation with Dover on an unknown date where Plaintiff "spoke about . . . different issues" and "what was going on in the group," [*See* Docs. 73 at 7, 29; 57-2 at 14 (Jan. 26, 2022 Goodale Dep. 50:10-52:23)], to support her claim, Plaintiff has not produced further evidence about that conversation, including when it occurred, as is her burden in proving her prima facie case. Nor did Plaintiff's Complaint allege this conversation was a basis for her retaliation claim [*See generally* Doc. 1].

33

did receive, or the "escalations" that she managed with any age discrimination she allegedly experienced. *Compare Mumm*, 727 F. App'x at 113 (concluding that a "threat to sue" if defendant "did not rectify the pay discrimination" could be protected activity), *with Balding-Margolis v. Cleveland Arcade*, 352 F. App'x 35, 45 (6th Cir. 2009) (concluding that complaints "concerning general work-related issues" were not protected activities where they did not "indict[e] that [plaintiff] was objecting to discriminatory conduct against her based on her membership in a protected class"). As such, she has not presented evidence supporting the first element.

But even if Plaintiff's complaints could constitute protected activity, Plaintiff has not demonstrated that the relevant decision-maker at Defendant knew of her complaints. As a matter of law, to show that Defendant "knew" of the protected activity, Plaintiff must offer "evidence sufficient to establish that the individual charged with taking the adverse employment action knew of" her complaints. *Braun*, 828 F.3d at 512 (quoting *Mulhall v. Ashcroft*, 287 F.3d 534, 552 (6th Cir. 2002)); *see also Roberts v. Principi*, 283 F. App'x 325, 332 (6th Cir. 2008) (explaining that "the relevant beliefs or motivations are those of the actual decisionmaker, usually a supervisor or manager"). As with the first element of her prima facie retaliation claim, Plaintiff did not oppose Defendant's assertion that Dover, the decision-maker regarding her termination, did not know of the complaints that Plaintiff made to Popwell and Miller [*See generally* Doc. 73 at 28-30]. More importantly, Plaintiff has not provided any evidence that Popwell reported his conversations with Plaintiff to anyone, much less Dover, who joined the CAM group after these complaints [*See* Doc. 57-1 at 25, 27 (Jan. 24, 2022 Goodale Dep. 93:13-15, 100:22-24)]. Nor has Plaintiff presented any evidence that Miller, who was "not directly involved" with Plaintiff's department, told Dover about Plaintiff's complaint regarding her raise [*See* Doc. 57-1 at 12 (Jan. 24, 2022 Goodale Dep. 40:1-4, 41:11-25)]. *See Blizzard*, 698 F.3d at 288 (holding plaintiff failed to

34

establish the second element of her prima facie claim where there was no evidence that her supervisor or "any other decision-maker was aware of [plaintiff's] conversation"). Without evidence that the relevant decision-maker knew of any protected activity, Plaintiff cannot make a prima facie case of retaliation under the ADEA. Accordingly, the Court grants Defendant summary judgment on Plaintiff's retaliation claim.

### III. <u>Conclusion</u>

For the reasons set forth in this Memorandum Opinion and Order, the Court (1) **DENIES** Plaintiff's "Motion for Spoliation Sanctions Including Application of the 'Missing Evidence Rule'" [Doc. 71] and (2) **GRANTS** Defendant's "Motion for Summary Judgment" [Doc. 55]. Because there are no claims remaining in this action, an appropriate judgment shall enter.

IT IS SO ORDERED.

KATHERINE A. CRYTZER
United States District Judge